## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

KROWN1 FZC,

      Plaintiff,

      v.

CRANE WORLDWIDE LOGISTICS,

      Defendant.

Case No. 18-cv-3001

Judge John Robert Blakey

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Krown1 FZC sued Defendant Crane Worldwide Logistics for breach of contract, alleging that Crane failed to make Krown1 its exclusive agent for air transport services provided under the Multimodal 2 Contract, in violation of the parties' March 10, 2015 Agreement for Subcontractor Services. *See* [19]. Crane countersued for breach of contract, claiming that Krown1 breached the parties' agreement by failing to provide Crane with its "best possible price" for the contracted services [49] at 21, ¶¶ 18–19. After the close of fact and expert discovery, the parties both filed motions for summary judgment: Krown1 seeks partial summary judgment on its claim and summary judgment on Crane's counterclaim; Crane seeks summary judgment just on Krown1's claim. For the reasons explained below, the Court grants Crane's motion [96] and denies Krown1's motion [90].

## I.     <u>Facts & Procedural History</u>[1]

Krown1, a company formed under the laws of the United Arab Emirates with its principal place of business in Dubai, UAE, provides airfreight services in the Middle East, Afghanistan, and other areas. [92] at ¶ 1; [111] at ¶ 1. Crane, a Delaware limited liability company with its principal place of business in Houston, Texas, serves as a full-service air, ocean, customs brokerage and logistics company, which, at times, uses subcontractors, like Krown1, to perform certain transportation services. [98] at ¶ 6; [107] at ¶ 6.

On March 10, 2015, Crane and Krown1 entered into a written agreement for subcontractor services ("Subcontractor Agreement") relating to a United States government contract known as Multimodal 2 Contract HTC-711-15-R-R001 ("MM2"). [98] at ¶ 8; [111] at ¶ 5; [92-4]. Under the MM2, the United States government named several prime contractors, including United Airlines, to handle the transportation of cargo to and from military bases and other locations throughout the world. [111] at ¶ 5. To fulfill its obligations, United subcontracted with Crane, which in turn subcontracted with Krown1, via the Subcontractor Agreement. *Id.* at ¶ 6.

---

[1] The Court has drawn these facts from the various Local Rule 56.1 statements filed by the parties: Krown1's L.R. 56.1(a)(2) Statement of Facts (SOF) in support of its motion [92], Crane's L.R. 56.1(b)(2) response thereto [111], and Krown's L.R. 56.1(c)(2) Statement of Additional Facts (SOAF) in support of its motion [119] (incorrectly labeled a Rule 56.1(b)(3)(C) SOAF)–including the exhibits attached to these submissions; as well as Crane's L.R. 56.1(a)(2) SOF in support of its motion [98] (incorrectly labeled as a Rule 56.1(a)(3) SOF), Krown1's L.R. 56.1(b)(2) response thereto [107] and L.R. 56.1(b)(3) SOAF [105], and Crane's L.R. 56.1(c)(2) SOAF in support of its motion [123] (incorrectly labeled as a Rule 56.1(b)(3)(C) SOAF)–including the exhibits attached to these submissions.

By way of background for the Subcontractor Agreement, Krown1's owner Ramachandran Sivakumar states that, sometime in 2014, Crane hired John Weir to head up Crane's government contracting efforts; Sivakumar had previously worked with Weir, and, in September 2014, Weir proposed to Sivakumar that Krown1 partner with Crane to provide services to United under the MM2. [92-1] at ¶¶ 2, 7–8. Krown1 accepted the invitation, and the parties executed the Subcontractor Agreement on March 10, 2015. *Id.* at ¶ 9.

Under the Agreement, Krown1 agreed to "offer Support services for the bidding and fulfillment of the abovesaid Contract including, but not limited to: (i) Air/Sea or Land Transportation from the origin to the destination or part thereof, (ii) Associated Customs clearance, MOD and Diplomatic permissions for the transfer and movement of cargo across various states." [92-4] at 2. The Agreement provided that Krown1 would provide such services "at the best possible price." *Id.* Additionally, the Agreement included an "Exclusive Agency" provision, pursuant to which Crane "confirms this agreement to be exclusive for the [MM2] Contract whether directly or indirectly except for Pre-existing Contracts identified prior to the submission of Support Data by Krown1." *Id.* The parties' Agreement also provided that "changes to the exclusivity must be agreed in writing" between Crane and Krown1. *Id.*

According to Krown1's Sivakumar, after agreeing to work together, the parties cooperated to craft key parts of what became United's MM2 bid; Krown1 had previously provided services under a prior multimodal contract and, as a result, Crane relied upon Krown1's experience and expertise, including the knowledge and

3

experience Krown1 shared in the course of assisting with United's bid for the MM2. [92-1] at ¶ 13. Sivakumar states that, after the parties executed the contract, pursuant to which Krown1 provided "best possible" pricing, he learned from Crane's John Weir that Krown1's pricing "came in very low as compared to others submitting bids." *Id.* at ¶ 14. Thus, at Crane's suggestion, Krown1 reviewed and modified its pricing and promptly provided the revised pricing to Crane. *Id.* According to Sivakumar, Weir provided Krown1 with an executed copy of the Subcontractor Agreement dated March 10, 2015, and Krown1 sent back a fully-executed copy to Weir and Crane the next day. *Id.* at ¶ 16.

According to Sivakumar, a key provision of the parties' Agreement was the "Exclusive Agency" clause, in which Crane agreed to use Krown1 as its exclusive agent for the services to be provided under the MM2—that is, for the air cargo services into and out of military bases. *Id.* at ¶ 17. This was important to Krown1 because, under the terms of the MM2, the government would alert the prime contractor to the details of a specific transport, and the prime contractor would then provide bids for that specific transport; thus, for each specific transport, each prime contractor (and any subcontractors working with the prime) had the opportunity to submit a bid and, potentially, be awarded the transport. *Id.* at ¶¶ 18–19. Krown1 included the "Exclusive Agency" provision to ensure that Crane worked with Krown1 on all bids for work under the MM2. *Id.* at ¶ 19. Crane agreed to this provision. *Id.* at ¶ 20.

4

In August of 2015, a few months after Crane and Krown1 executed the Subcontractor Agreement, Sivakumar wrote to Weir to confirm certain commercial terms of the contract. *Id.* at ¶ 21. In his email, Sivakumar wrote that: (1) the fees United and Crane would earn on the MM2 transports would be 2% and 3%, respectively; (2) Krown1 would have final say over the price per pound on MM2 bids; (3) communications from the government would go directly to Krown1 by a distribution list set up by Crane; (4) Krown1 would be named a subcontractor with the government; and (5) Crane maintained responsibility for all insurance or liability requirements. *Id.* Weir responded a few days later, stating "Ok let's start with this for now and excluding LTO's"; Sivakumar took this to mean that Crane agreed to the terms he proposed. *Id.* at ¶ 22.

Sivakumar represents that, before the MM2 deal with Crane, Krown1 had actually considered winding down its operations; the plans with Crane and United ended those discussions, and Krown1 opted instead to expand its operations to support United's bid and the MM2 work. *Id.* at ¶¶ 23–25. Krown1, based upon the terms of the Subcontractor Agreement, hired additional personnel with skills especially well-suited for MM2 opportunities, such as a loadmaster who would be able to maximize the cargo that could be loaded onto the planes that would be handling MM2 transports. *Id.* at ¶ 26.

Ultimately, the government named United as one of six prime contractors for MM2, and the government issued its first request for quotes in April 2016. [92-1] at ¶¶ 39–40. The process for bidding on MM2 transports began with the government

issuing, via email, a request for quotes (RFQ) to its prime contractors; such requests included details about the shipment, including description of the cargo, its origin and destination, and the required delivery date. *Id.* at ¶¶ 41, 43. The government also issued requests for information (RFI), which required a similar response process but (unlike RFQs) did not always result in an actual transport. *Id.* at ¶ 42. Upon receipt of a request, United or Crane would share the information with Krown1, which would then work to put together a bid, including determining which aircraft to use, how to load the cargo into the aircraft, arranging for the aircraft, and arranging for any other aspects of the shipment. *Id.* at ¶ 45. As part of its process, Krown1 needed to know the details of the transport plan for shipment, particularly when the cargo would arrive or depart by sea carrier, so that it could make the necessary arrangements. *Id.* Once it put together a bid, Krown1 would then provide Crane with a quote for its work, and Crane in turn would then use Krown1's piece to create a complete, end-to-end quote to be submitted to the government, either by Crane or by United. *Id.* at ¶ 46. The government would then consider the primes' competing bids and award the bid to the contractor that, in the government's assessment, provided the "best value." *Id.* at ¶ 47.

Krown1 claims that, in November 2017, the government awarded a series of MM2 transports of milk to the United/Crane/Krown1 team; the price was set (as it typically is) at a total price per pound—$1.52—with the expectation that the transports would include at least 40,000 pounds. *Id.* at ¶ 60. When the transports began in November 2017, Krown1 successfully handled the transports and billed as

agreed. *Id.* at ¶ 61. But it soon became clear that the shipments would weigh significantly less than expected (meaning the parties would make less money), and Krown1 complained to Crane, which advised that it was working with the government to find a way to cover the pricing shortfall. *Id.* at ¶ 62. At the same time, the government balked about paying Krown1 for dry ice used in connection with the milk transports, as it believed it was paying someone else for dry ice (even though Krown1's piece of the bid for the milk transport included the provision of dry ice for each milk shipment). *Id.* at ¶¶ 63–65. Based upon the government's complaints, beginning in December 2017, Crane demanded that Krown1 reduce its bills to exclude the dry ice services, both prospectively and retroactively. *Id.* at ¶ 66. Krown1 complied, refunding Crane $419,057.58, though Krown1 has no idea whether Crane actually turned these monies over to the government. *Id.* at ¶¶ 67–68.

In addition to feeling squeezed over dry ice costs, Krown1 also claims that Crane sabotaged Krown1's success under the MM2 by refusing to secure a sea carrier and by playing fast and loose with the parties' exclusivity agreement.[2] According to Krown1, a sea carrier was crucial for success under MM2. Indeed, the sea carrier's schedule typically determined the transport options available for Krown1's work, as Krown1 "had to have the cargo to the port in time for it to be loaded onto the vessel." *Id.* at ¶ 48. As a practical matter, Krown1 knew that the carriers with the greatest

---

[2] This Court previously determined that Krown1 may not pursue a breach of contract claim based upon any failure to secure a sea transport subcontractor, [37], [38] at 6–7, 9, and these allegations thus are relevant for present purposes only to the extent they provide context.

sea options would be able to offer the most cost-efficient transport options, since they could choose from a number of different vessels to get the cargo where it needed to be by the required deliver date. Sea carriers with more ships also provided greater opportunities to expand capacity, even moving non-MM2 cargo along with MM2 cargo, to maximize transport efficiency, economy, and profits. *Id.* at ¶ 49. For other transports, using a sea carrier, though not required, could have lowered the pricing of a bid, making it easier for the bid to provide the "best value" and ensuring that the government would award the team the transport. *Id.* at ¶ 52. Yet United and Crane never secured a sea carrier for MM2 transports, which prevented the parties from securing bids at the anticipated level. *Id.* at ¶¶ 50, 53. In fact, Crane regularly advised Krown1 that United and Crane would not be bidding on certain RFQs because they lacked a sea carrier. *Id.* at ¶ 51. As a result of these issues, the team won fewer MM2 jobs than anticipated. *Id.* at ¶¶ 53, 55.

As to the exclusivity agreement, Krown1 alleges that, after the parties executed the Subcontractor Agreement, Crane tried to remove the exclusivity provision several times; each time, Krown1 refused. [92-1] at ¶ 27. Sivakumar states that Crane first sought to modify the parties' contractual relationship in the Spring of 2015, when Crane asked Krown1 to sign a new agreement; Krown1 refused, explaining that, in its view, the Subcontractor Agreement already adequately addressed the parties' relationship. *Id.* at ¶ 28. Sivakumar states that the issue arose again on June 19, 2015, when "Crane sent Krown1 a series of documents regarding compliance with various policies and laws as part of an effort to get Krown1

set up as a vendor for Crane." *Id.* at ¶ 29. Crane eventually sent Krown1 a new, non-exclusive agency agreement to sign; Krown1 agreed to the new terms, but only for non-MM2 transport work. *Id.* at ¶ 30. Crane responded that it "understands your position in regards to the non-exclusive agency agreement" and asked Krown1 to sign the agreement; it did so, but added a provision that the non-exclusive agency agreement did not apply to services performed by Krown1 under "special contracts like MM2." *Id.* at ¶ 31. With the revision carving out MM2 work, which still fell within the parties' exclusive contract, the parties executed the new agreement in August 2015. *Id.*

Crane attempted to modify the parties' exclusive agency agreement a third time in February 2018, when Chad Taylor (the chief Crane executive responsible for MM2) came to Dubai to meet with Krown1: Taylor again proposed removing the exclusivity language, and Krown1 again refused. *Id.* at ¶¶ 33–35. Sivakumar previously met with Keith Winters, another Crane executive in charge of MM2, in late 2015; neither Winters nor Krown1 suggested or agreed to modify the parties' exclusivity deal.

Krown1 claims that, in February 2018, it received an award email announcing that United and Crane had been awarded an MM2 bid on an RFQ for which Krown1 had provided Crane a bid; initially thrilled, Krown1's excitement turned to puzzlement and then bitterness when Crane advised Krown1 that it was not part of the team for the move. *Id.* at ¶¶ 57–58. Krown1 claims that Crane's use of other subcontractors for MM2 work violated the parties' Subcontractor Agreement.

9

Sivakumar claims that, as a result of Crane's failure to honor the parties' agreement, in April 2018, Krown1 started seeking MM2 opportunities with other companies. *Id.* at ¶ 69. Krown1 worked on MM2 bids with Liberty Global Logistics LLC ("LGL"), another prime contractor; between April 2018 and May 2019, Krown1 worked with LGL on 64 bids, 5 of which they won. *Id.* at ¶¶ 70–71. Krown1 admits that, on occasion, its bids for LGL included different prices than its bids for Crane; but it claims the differential stemmed from Crane's failure to secure a sea carrier. *Id.* at ¶ 72.

Crane tells a different story about certain aspects of the parties' Subcontractor Agreement. First, Crane argues that the exclusivity language in the parties' contract did not require Crane to use Krown1 for all MM2 bids; rather, such language meant that the terms included in the parties' contract applied only with respect to the MM2 work. [110] at 7–8. Crane argues that the contract required it to use Krown1 only if Crane could not self-perform the work, and only if Krown1 provided the "best possible price." *Id.* at 8. Although Crane has offered an interpretation of the contract that differs from Krown1's on this issue, Crane's own representatives have conceded that they operated under the assumption that all MM2 bids had to go through Krown1. John Weir testified that, under the parties' contract, Crane had "to use Krown1 for the military multimodal 2 in the Middle East." [93] at 106. And Daniel Ivy, Crane's operations manager, at least acknowledged that Crane accepted Krown1's interpretation of the exclusivity agreement. [93] at 50 ("Chad would have come back and said nothing goes in the Middle East without using Krown1. I understood that.

10

But then we came back with these and said we're missing opportunities"), 57 (conceding that he understood that the Agreement was supposed to be exclusive).

Just as Krown1 claims it breached the Agreement only after Crane breached, Crane argues that, to the extent it breached the exclusivity provision, it did so only after Krown1 breached its contractual obligation to provide "best possible pricing." With regard to pricing, John Weir testified that the parties' contract required Krown1 to provide the "best possible price" and that, if Krown1 failed to do so, Crane would not get the award. [93] at 105. Daniel Ivy testified that Krown1's bid pricing prevented Crane from winning MM2 bids. [93] at 17–19. Ivy testified that Krown1 was not providing competitive pricing for Crane. *Id.* at 20. In fact, Ivy testified, Krown1's pricing was considerably higher than other transport providers—in one instance, 27% higher, *id.* at 53, and, in the case of the February 2018 bid (which Crane won using a transport provider other than Krown1), Krown1's bid exceeded the included bid by more than $200,000, *id.* at 56.

Crane also suggests that the parties' contract may be invalid, as Crane signed it under duress. [93] at 107. Crane claims that Krown1 drafted the contract without any input from Crane, and demanded, on the eve of United's submission of its bid, that Crane sign; Crane signed the agreement because without Krown1's portion of the bid, United's bid would have been incomplete and unsuccessful. Id.; [111] at 39, ¶ 1. Crane further argues that it never agreed to amend the Agreement and never accepted the terms set forth in Sivakumar's August 2015 email; Crane's noncommittal response of "let's start with that for now," was not an acceptance but

11

rather an attempt to deflect a fight on the issue. [111] at 39–40, ¶¶ 2–3. In fact, Crane argues, neither party performed according to the terms Sivakumar laid out. *Id.* at 40, ¶ 4.

With respect to the milk runs, Crane disputes Krown1's claim that Crane somehow forced Krown1 to change its pricing or refund money and also denies that it kept any refund; rather, the parties agreed to pricing revisions for their own benefit and they agreed to remove the dry ice fees at the government's request; Crane turned the entire refund over to United, which credited the government for the double-billing. [93] at 44, 144.

Although the parties disagree about who fired the first shot, they agree that by early 2018, their business relationship had deteriorated. On April 27, 2018, Krown1 sued. *See* [1]. Krown1's operative, single-count complaint alleges that Crane breached the parties' agreement by: (1) using air transport service providers other than Krown1, including on the bid awarded to Crane on February 15, 2018, [19] at ¶ 43; indicating to Krown1 that it would not provide it with any additional bids under the agreement unless Krown1 agreed to fundamentally alter the parties' agreement by removing the exclusive agency provisions, *id.* at ¶ 44; and by not accepting Krown1's pricing and instead insisting that Krown1 lower its pricing so that Crane could earn a greater profit on work done by Krown1 under the agreement, *id.* at ¶ 45.

In response to Krown1's complaint, Crane countersued, alleging (in a one-count counterclaim) that Krown1 willfully breached the parties' contract by failing to

provide Crane with Krown1's "best possible price" for the contracted for services. [49] at ¶¶ 18–19.

With discovery complete, both sides move for summary judgment, [90], [96]. Krown1 seeks partial summary judgment on its complaint and summary judgment on Crane's counterclaim, *see* [129]. Crane seeks summary judgment just on Krown1's claim. *See* [96].

## II. <u>Legal Standard</u>

Summary judgment is proper where there is "no dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

In determining whether a genuine issue of material fact exists, this Court must construe all facts and reasonable inferences in the light most favorable to the non-moving party. *King v. Hendricks Cty. Comm'rs*, 954 F.3d 981, 984 (7th Cir. 2020). The non-moving party bears the burden of identifying the evidence creating an issue of fact. *Hutchison v. Fitzgerald Equip. Co., Inc.*, 910 F.3d 1016, 1021–22 (7th Cir. 2018). To satisfy that burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Barnes v. City of*

*Centralia, Illinois*, 943 F.3d 826, 832 (7th Cir. 2019). Thus, a mere "scintilla of evidence" supporting the non-movant's position does not suffice; instead "there must be evidence on which the jury could reasonably find" for the non-moving party." *Anderson*, 477 U.S. at 252.

## III.  Discussion & Analysis

As noted, Krown1 seeks summary judgment on its own breach of contract claim, and on Crane's breach of contract counterclaim. Crane seeks summary judgment on Krown1's claim only. The Court begins with the cross motions filed on Krown1's complaint.

### A.  Motions Regarding Krown1's Breach of Contract Claim

Under Illinois law, to prevail on a breach of contract claim, a plaintiff must prove: "(1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of contract by the defendant; and (4) resultant injury to the plaintiff." *Asset Exchange II, LLC v. First Choice Bank*, 953 N.E.2d 446, 455 (Ill. App. Ct. 2011). "Only a duty imposed by the terms of a contract can give rise to a breach." *TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 631 (7th Cir. 2007) (quoting *W.W. Vincent & Co. v. First Colony Life Ins. Co.*, 814 N.E.2d 960, 967 (Ill. App. Ct. 2004)). The parties' arguments focus on the performance and damages elements.

### 1.  Krown1's Motion for Partial Summary Judgment

In its motion for partial summary judgment, Krown1 effectively concedes that it violated the terms of the parties' Agreement when it worked with other companies on MM2 bids; but it argues that its conduct does not constitute a breach because

14

Crane had already breached the parties' exclusivity provision. Krown1 claims the undisputed evidence shows that it fully performed its obligations under the Subcontractor Agreement (at least until Crane breached its exclusivity obligations), and that Crane breached the parties' Subcontractor Agreement in two ways: (1) by working with vendors other than Krown1 on MM2 transports in violation of the parties' exclusivity clause; and (2) by forcing Krown1 to modify its billing on milk transports in violation of the contract language giving Krown1 final say on per pound pricing. [129] at 12–15, 17–18.

Krown1 also claims the undisputed evidence shows that it suffered damages as a result of Crane's breaches. On exclusivity, Krown1 argues that Crane handled seven MM2 bids—worth $1,892,169—either on its own or with companies other than Krown1, in violation of the parties' agreement, and claims this amount as damages. *Id.* at 15–16. Krown1 also claims damages of $419,057.58 for the milk transport dry ice refunds; Krown1 claims Crane forced it to reduce its bills and return these funds in violation of the parties' agreement that Krown1 would have "final say" for the MM2 bid per pound pricing. *Id.* at 17–18. Krown1 seeks additional damages but claims that "genuine disputes exist regarding the extent of Krown1's harm, preventing summary judgment as to damages." *Id.* at 15.

As the Court will discuss below, Krown1's stated damages find no support in the record. More importantly, Krown1's motion, which seeks summary judgment on liability while reserving the issue of damages for trial, is predicated on a false notion that damages and liability are separate issues. They are not. Damages are an

essential element of a breach of contract claim in Illinois. *Ins. Benefit Grp., Inc. v. Guarantee Tr. Life Ins. Co.*, 91 N.E.3d 950, 964 (Ill. App. Ct. 2017); *TAS Distrib. Co. v. Cummins Engine Co.*, 491 F.3d 625, 631 (7th Cir. 2007). To recover for breach of contract, a plaintiff must establish both that it "sustained damages" and that it has a "reasonable basis for computation of those damages"; the party claiming breach of contract must prove its damages "to a reasonable degree of certainty." *TAS*, 491 F.3d at 632.

Because damages constitute an essential element of a breach of contract claim, Krown1's failure to prove them precludes summary judgment (even partial summary judgment) in its favor. Krown1 cannot prove liability simply by alleging that it was harmed; rather it must prove that it was harmed, which includes demonstrating damages to a reasonable degree of certainty. It cannot simply reserve the issue for trial. For this reason, the Court denies Krown1's motion for summary judgment on its breach of contract claim.

### 2. Crane's Motion for Summary Judgment

For purposes of its own motion, Krown1 opted not to prove damages. Crane takes the damages issue one step farther in its summary judgment motion, arguing that, in fact, Krown1 cannot offer sufficient evidence to create a triable issue on damages.[3] As a result, Crane moves for summary judgment in its favor on Krown1's

---

[3] Crane claims "Krown1 concedes that it cannot prove the damages it incurred due to Crane's alleged breach." [110] at 5. Not exactly. Krown1 claims the record shows it suffered harm but concedes that issues of fact exist as to the extent of that harm.

16

breach of contract claim, arguing that—regardless of who breached when—Krown1 cannot support any damages claim.[4]

Krown1 initially alleged that Crane's breaches (its use of transport service providers other than Krown1 and its requirement that Krown1 modify its pricing) caused it to suffer damages "in an amount to be determined at trial." [19] at 9. In its summary judgment motion, Krown1 elaborates that "at a minimum, Krown1 was harmed when, in February 2018, Crane was awarded the April 2018 transport but failed to work with Krown1 on it." [129] at 16. As explained above, Krown1 claims that Crane received payments totaling more than $1.8 million on transports handled with companies other than Krown1 in violation of the exclusivity clause. *Id.* Krown1 also claims that Crane "received millions of dollars of payments related to MM2 transports it handled itself in further violation of the Subcontract." *Id.* at 16 n.7. Finally, Krown1 claims that Crane harmed it by requiring it to refund $419,057.58 in dry ice costs related to the milk transport runs, which Krown1 claims Crane "seemingly kept" for itself. *Id.* at 18.

Taking the latter first, the record contains no evidence that Crane kept the dry ice refund; on the contrary, the record shows that Crane turned the money over to United, which credited the government. Moreover, the Subcontractor Agreement is utterly silent on dry ice pricing for milk runs, and the Court sees no provision in that

---

[4] Crane does not move for summary judgment on its counterclaim for breach of contract.

17

contract that would require Crane, or the government, to pay for the same services twice. Krown1 cannot prove damages based upon the alleged dry ice refunds.

As to any lost profits Krown1 claims resulted from Crane's self-performance or use of other transport service providers, Krown1 has failed to prove these damages to a reasonable degree of certainty. *TAS Distributing*, 491 F.3d at 631; *Sterling Freight Lines, Inc. v. Prairie Material Sales, Inc.*, 674 N.E.2d 948, 950 (Ill. App. Ct. 1996). To support its damages claim, Krown1 offers the testimony of its owner, Mr. Sivakumar, who testified that Crane first breached the parties' contract in February 2018, by using providers other than Krown1. [99-3] at 66–67. He also testified that Krown1 claims three categories of damages based upon that breach: (1) damages relating to shipments Crane won with other providers, *id.* at 67; (2) damages relating to additional bids Crane submitted with other providers that were not awarded (but ostensibly would have been awarded if Crane has used Krown1); and (3) Krown1's operating costs from 2016 through 2018.

The first category of lost profit damages relates to shipments Crane won with other providers, *id.* at 67; Krown1 theorizes that if Crane had used Krown1 for those bids, it still would have won them, and then Krown1 would have made money, *id.* at 70. But the record contains no factual basis to support that assumption. And when asked the basis for his assumption, Sivakumar testified that "getting lower pricing necessarily does not amount to winning every time. And, similarly, we feel they may have lost out on an opportunity in quoting a low price—in not quoting—in not getting it at a higher price." *Id.* at 71. In other words, if you offer a lower price, you miss out

18

on an opportunity to make a higher profit. This appears to be consistent with Crane's claim that Krown1 failed to provide—or even appreciate the significance of—"best possible price." Sivakumar acknowledged that the government awarded bids based upon a "best value" assessment, *id.* at 71, 73, and the record provides no basis to conclude that a bid using anything but the lowest price possible would have won the project. Krown1 speculates further when it contends that if Crane had used Krown1's bids, which were higher than the bids that earned the project, Crane still would have been awarded the project. If Krown1 provided higher pricing, Crane's bid incorporating that higher pricing necessarily would not have reflected the "best possible price." Indeed, Sivakumar admits that he had no idea how many primes submitted bids for the awards Crane won using another provider; nor does he have any idea what pricing they submitted. *Id.* at 77. He has no basis, other than conjecture, for his claim that Crane would still have been awarded the bids if it had used Krown1's pricing.

For the second category of lost profits damages, Sivakumar estimates that Crane submitted forty to fifty MM2 bids with other providers and, taking an average of the bids Crane won over the life of the MM2 ($146,243.27), he estimates that those forty to fifty bids would have yielded revenue of roughly $5.8 to $7.3 million. For this calculation, Sivakumar picked forty to fifty because Crane was actually awarded eighty-eight bids under the MM2; it is, in his words, an estimate. *Id.* at 78, 79. But it is an estimate without any evidentiary basis, because he provides no logical correlation between the eighty-eight bids awarded to Crane during the four-year life

19

of the MM2 and the theoretical forty to fifty bids hypothetically awarded during the period from Crane's breach in February 2018 to the end of the MM2 in March of 2019. Krown1 argues that if Crane bid with another provider and won, as it did in February 2018, it is reasonable to assume that Crane would continue to bid with other providers. *Id.* at 87. Although the logic is appealing, that assumption says nothing about the number of bids actually awarded and cannot support Sivakumar's forty-plus bid estimate. Based on the record, that number (which Krown1 then used as a multiplier to calculate its damages) rests upon pure speculation. In fact, Sivakumar admitted that the MM2 awards are publicly available, and, if he had wanted to, he could have figured out if Crane was actually awarded anything close to the forty to fifty bids he claims for purposes of calculating Krown1's damages, *id.* at 95; instead, he chose to guess.

The third category of damages Krown1 claims stemming from the exclusivity breach is costs; Sivakumar testified that Krown1 prepared a costs report from the company's audited financial statements and extracted trial balances. [99-3] at 97. He testified that the report reflects costs incurred by both Krown1 FZC and Krown1 Airfreight FZE, *id.* at 97, the latter of which unquestionably has no contractual relationship with Crane. Additionally, Sivakumar concedes that this category of damages includes costs incurred prior to any breach, and even before the MM2 began. *Id* at 104. Indeed, Sivakumar testified that Krown1's damages theory claims the total operating costs of both companies from 2015 through 2018. Krown1's claim for damages covering its full operating costs for this three-year period (as well as the

costs of its affiliate) finds no support in the parties' contract. Indeed, its calculation is wholly untethered to the underlying cause of action, and the lack of any contractual basis for Krown1's damages calculation highlights the arbitrary and speculative nature of its damages claim.

Based upon the record evidence, the Court finds that Krown1 fails to provide a reasonable basis to support its damages computation and thus cannot prove its damages to a reasonable degree of certainty. As a result, its claim fails and summary judgment in Crane's favor on Krown1's claim is appropriate. *See TAS*, 491 F.3d at 632. Sivakumar's testimony demonstrates that Krown1's damages calculations remain unsubstantiated, predicated on speculation and guesses; the financial summaries they created to support their claim, which simply reflect the numbers discussed above, cannot change the fact that the numbers have no basis in the contract or in the evidence. *See, e.g., Wasson v. Peabody Coal Co.*, 542 F.3d 1172, 1176 (7th Cir. 2008) (confirming the decision to set aside a damages award based on nothing but speculation, reflected in plaintiff's "scratch-paper work-up of his guess" on damages); *Kirkpatrick v. Strosberg,* 894 N.E.2d 781, 792 (Ill. App. Ct. 2008) (explaining that damages must be proved with reasonable certainty and cannot be based on conjecture or speculation). Indeed, the summaries are only as good as the underlying data, and to the extent such data exists Krown1 has never produced it. As a result, Krown1 cannot prove damages. *See Judson Atkinson Candies, Inc. v. Latini–Hohberger Dhimantec*, 529 F.3d 371, 382 (7th Cir. 2008) (the admission of a summary under Fed. R. Evid. 1006 requires a proper foundation as to the

admissibility of the material that is summarized and a showing that the summary is accurate); *PCA Cap. Partners v. G&M Int'l, LLC*, No. 16 C 11470, 2018 WL 4590319, at *3 (N.D. Ill. Sept. 25, 2018) (if a party wants to submit evidence in the form of a summary, the underlying documentation must be admissible and it must comply with Federal Rule of Evidence 1006; although Rule 1006 "does not require that the documentation underlying the summary be introduced into evidence, it does require that the documents be made available to the opposing party for examination and copying at a reasonable time and place."), *aff'd sub nom. PCA Cap. Partners, Inc. v. G&M Int'l, LLC*, 790 F. App'x 822 (7th Cir. 2020).

The record shows that Krown1 can offer no competent proof of damages stemming from any claimed breach by Crane, a necessary element of its claim. *See DiPerna v. Chi. Sch. of Pro. Psychology*, 893 F.3d 1001, 1006 n.6 (7th Cir. 2018) ("Damages are an essential element of a breach of contract action and a claimant's failure to prove damages entitles the defendant to judgment as a matter of law.") (quoting *In re Ill. Bell Tel. Link-Up II*, 994 N.E.2d 553, 559 (Ill. App. Ct. 2013)). Accordingly, the Court finds that Krown1 cannot prove breach of contract and, therefore, grants Crane's motion for summary judgment on Krown1's claim [96].

### B.     Krown1's Motion on Crane's Breach of Contract Claim

Before turning to the merits of Krown1's motion for summary judgment on Crane's breach of contract claim, the Court must consider Krown1's argument that Crane's expert report should be stricken. Before filing for summary judgment, Krown1 moved to strike Crane's expert report, [72], claiming that Crane failed to

disclose certain documents underlying the expert's damages calculations during fact discovery. *Id.* at 6. Because Krown1 raised the same arguments in its summary judgment brief, the Court denied the separate motion to strike, and indicated that it would consider the issue here. [132].

At the same time, however, the Court also gave Krown1 an opportunity to explain how Crane's alleged late production prejudiced Krown1 and its ability to brief the summary judgment motion. *Id.* In response, Krown1 conceded that it did not require any additional evidence at the summary judgment stage but noted, without explanation, that it might require additional evidence for trial. Likewise, even though Krown1 claimed in its motion to strike that Crane failed to produce all documents relied upon in Crane's expert report, in Krown1's subsequent statement it conceded that it cannot say for sure that any documents were actually missing from Crane's production because of the way the exhibits were labeled. [133] at 3 n.2. In short, Krown1 had an opportunity to demonstrate any need for discovery and declined to do so. As a result, any claimed need for post-summary judgment discovery rings hollow. *See Pack v. Middlebury Cmty. Sch.*, No. 20-1912, — F.3d —, 2021 WL 915911, at *8 (7th Cir. Mar. 10, 2021) ("summary judgment is the put-up-or-shut-up moment in a lawsuit").

Based upon this factual record, the Court can find neither a sanctionable discovery violation by Crane, nor any material prejudice to Krown1. Krown1 claims that Crane did not produce its final damages documents until January 24, 2020—two weeks after the close of fact discovery. [129] at 21 n.10; [133] at 2 n.1. But a two-

week delay hardly merits sanctions, especially given the complete shutdown triggered less than two months later by the global pandemic. Additionally, Krown1 possessed all of Crane's damages discovery before deposing Crane's damages expert (Joseph Egan), before filing its summary judgment motion, before responding to Crane's summary judgment motion, and long before trial (in fact, this case has not yet even been set for trial). Rule 26 is designed to "avoid surprise and give the opposing party a full opportunity to evaluate the expert's methodology and conclusions and to respond appropriately." *Gicla v. United States*, 572 F.3d 407, 411 (7th Cir. 2009). Krown1 does not and cannot argue surprise, and it cannot show that Crane failed to provide the bases for its expert's opinions on damages. Under these circumstances, the record provides no basis to strike Crane's expert report or any part of its damages claim.

The Court turns now to the merits of Krown1's motion for summary judgment on Crane's breach of contract counterclaim. Krown1 argues that Crane's counterclaim for breach of contract necessarily fails because the record shows Crane breached the parties' agreement and lacks any evidence showing that Krown1 breached the agreement. [129] at 15, 16.

According to Krown1, Crane's claim assumes Krown1 breached the agreement by failing to provide the "best possible price" in its MM2 bids, but the parties' contract imposed no duty on Krown1 to do so. *Id.* at 19–20. Krown1 also argues that any "breach" by Krown1 constituted "nothing more than an attempt to mitigate its

damages *after* Crane's breach." *Id*. at 20. Krown1 also argues that the record precludes Crane from demonstrating any injury.[1] *Id*. at 21.

The Court disagrees on all fronts. Krown1's motion fails because disputed issues of material issues remain, including who breached the parties' contract and when. The record includes evidence from which a jury could reasonably find that Crane performed its contractual obligations and that Krown1 breached its contractual obligations.

Moreover, to the extent Krown1 argues that the parties' contract required Crane to use Krown1 exclusively for MM2 work but did not require Krown1 to provide "best possible pricing," the evidence fails to support that theory. The contract itself included "best possible pricing" language, and everyone agrees that the government relied on that basis in awarding bids. Under Krown1's interpretation, as Crane notes, Krown1 could use whatever price it wanted in its bid and Crane would have to use it. Based on the record, such a reading is absurd. Indeed, Sharon Hogg, a senior government program manager at United, testified that United declined subcontracts for government work that included an exclusivity clause precisely because, "by definition, exclusivity prevents the ability to look for best value"—something required for all government work. [93] at 163. Krown1's suggestion that the exclusive contract failed to build in a best possible pricing obligation, in addition to defying common business sense, finds no support in the evidentiary record.

---

[1] To the extent Krown1's argument on damages is predicated on the Court agreeing to strike Crane's expert report, the argument is moot given the Court's decision above.

In fact, evidence in the record contradicts Krown1's view that the parties' contract did not impose an obligation to provide "best possible pricing": Lamonte Martin, operations manager for Krown1, testified that Crane's role under the Subcontractor Agreement was to "supply Krown1 with the [MM2] bid data that [Krown1] needed to bid the contract," [99-2] at 87, and Krown1's obligation was to provide "the best price possible." *Id.* at 93. Martin's testimony also undermines Krown1's interpretation of the contractual exclusivity language where Martin testified that Krown1 knew about instances where Crane went "direct" on MM2 bids but was not alarmed by such conduct (indicating that such conduct did not constitute a contractual breach). [99-2] at 212.

The parties do not dispute that they both failed to honor their obligations under the contract. Krown1 admits that it failed to provide best possible pricing, and Crane admits that it submitted MM2 bids using transport service providers other than Krown1. Krown1's motion assumes that Crane used other transport service providers *before* Krown1 stopped providing best possible pricing. But the record includes evidence showing that, in fact, by the time Crane started using other transport service providers, it had already discovered that Krown1 had failed to provide "best possible pricing." Daniel Ivy, Crane's government operations manager, states in his declaration that, in connection with MM2 work, Krown1 failed on numerous occasions to provide Crane with the "best possible price"; worse yet, Ivy states, Krown1 provided Crane's competitors with "better or lower pricing on the same bids." [113-1] at ¶¶ 5–6. Ivy testified at his deposition that Krown1's failure to

26

provide best pricing triggered Crane's decision to seek out other transport service providers in the first place. [93] at 17–19, 20. Based upon this evidence, a jury could, in fact, determine that Crane performed under the contract and Krown1 breached the contract.[5]

Additionally, in contrast to Krown1, Crane has proffered competent evidence explaining its damages calculations to a reasonable degree of certainty: Crane, relying on its expert report, claims it sustained $63,784.67 in damages as a result of Krown1's breach, including $8,679.04 for costs Crane incurred in preparing bids where Krown1 effectively underbid its United/Crane team, and $55,105.63 in lost profits (the profits Krown1 made on MM2 transports done with a carrier other than Crane (LGL), which Crane would have won if Krown1 had provided it with best possible pricing). [73] at 5–6. Although a jury will certainly be free to reject Crane's calculations, the damages claim is at least based in the contract and on the evidence.

## IV. <u>Conclusion</u>

For the reasons explained above, the Court denies Krown1's motion for summary judgment [90] and grants Crane's motion for summary judgment [96] as to Krown1's breach of contract claim. The Court also denies Krown1's motion for summary judgment as to Crane's breach of contract claim [90]. The parties shall file a joint status report by April 30, 2021 confirming whether Crane intends to proceed on its counterclaim, indicating whether the parties are interested in a settlement

---

[5] Clearly, based upon such disputed issues of fact, Crane would not have prevailed on a motion for summary judgment on its breach of contract claim, if it had filed one.

conference with the assigned Magistrate Judge, and proposing agreed trial dates in the first half of 2022 (as well as an estimate of trial length).

Dated: March 31, 2021

Entered:

John Robert Blakey
United States District Judge